**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
: 
: 
AVANTOR PERFORMANCE : 
MATERIALS, INC., : 
: 
         Plaintiff, :      Civil Action No. 15-3540 (DEA)
: 
      v. : 
:      **OPINION**
UNITED STEEL, PAPER AND RUBBER, : 
MANUFACTURING, ENERGY, ALLIED : 
INDUSTRIAL AND SERVICE : 
WORKERS INTERNATIONAL UNION : 
 LOCAL 04-729, : 
: 
         Defendant. : 
_____:

ARPERT, Magistrate Judge.[1]

     This matter comes before the Court by way of separate motions for summary

judgment by (1) Plaintiff Avantor Performance Materials, Inc. ("Plaintiff" or "Avantor"); and

(2) Defendant United Steel, Paper and Rubber, Manufacturing, Energy, Allied Industrial and

Services Workers International Union Local 04-729 ("Defendant" or "Local 729").  Both

parties contend they are entitled to judgment as a matter of law on the one claim that remains

in this case, *i.e.*, Defendant's counterclaim alleging that Plaintiff breached its obligations

under two collective bargaining agreement ("CBAs") to maintain certain benefits with respect

to Avantor's 401(k) Plan.  Specifically, Defendant alleges that when Plaintiff eliminated a

certain benefit from the plan, it breached a term in the CBAs which stated that "[t]he

_____
[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to
Magistrate Judge jurisdiction, and the District Judge has authorized the undersigned to conduct all proceedings
in this matter.

Company will maintain a 401(k) plan that covers all eligible employees that is substantially similar to the previous plans." *See* Counterclaim, ECF No. 5

The Court heard oral argument on the motions on October 17, 2017. For the reasons below, Plaintiff's motion for summary judgment is granted, and Defendant's motion is denied.

## I. Background

### A. The 2008 Collective Bargaining Agreements

Avantor operates a manufacturing and research facility in New Jersey. ECF No. 29-40 at ¶ 3. The bargaining representative for the production and maintenance employees at Avantor is the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and its Local 729 (together, the "Union"). ECF No. 41 at ¶¶ 6, 7.

Avantor previously operated as Mallinckrodt-Baker, Inc. ("MB" or the "Company"[2]) and was wholly owned by Covidien, PLC ("Covidien"), whose parent was Tyco International Inc. ECF Nos. 29-40 at ¶ 4, 8; 41 at ¶¶ 4, 8. MB and the Union were parties to two CBAs (the "2004 CBAs") that were effective from March 29, 2004 through March 30, 2008. These agreements governed the terms and conditions of employment for two groups of MB's employees—those in the "Technical Unit" and those in the "P&M Unit". ECF No. 29-40 at ¶¶ 9, 10; ECF No. 41 at ¶¶ 9, 10. Both of the 2004 CBAs provided that covered employees could participate in the Tyco International (U.S.) Inc. Retirement and Savings Plan (the "Union's 401(k) Plan"). With regard to the Union's 401(k) Plan, the CBAs provided the company would match employee contributions at 50% up to the first 6% of base pay. ECF No. 29-6 at

---

[2] The Court at times will refer to MB as well as its successor, Avantor, as the "Company."

24.  Additionally, these CBAs provided that a defined benefit pension plan, *i.e.*, the "J.T. Baker Bargaining Unit Retirement Plan" would "be in effect for the duration of the Agreement[s]." ECF No. 42-1 at ¶ 6.

Shortly before expiration of the 2004 CBAs, in February 2008, MB and the Union entered into negotiations for successor agreements. ECF Nos. 29-40 ¶ 12; 41 at ¶ 12.  During those negotiations, MB proposed freezing the then-existing defined benefit pension plan and replacing the Union's 401(k) Plan with the "Covidien Hourly 401(k) Retirement Savings and Investment Plan" (hereinafter, the "Covidien 401(k) Plan").  The Covidien 401(k) Plan was considered an enhanced version of the Union's 401(k) Plan. ECF Nos. 29-40 at ¶¶ 15, 16; 41 at ¶¶ 15, 16.  There appeared to be several advantages that the Covidien Plan had over the Union's Plan, including that it had a higher company match, it included overtime compensation as eligible compensation, it allowed older participants to make catch-up contributions, and it had no waiting period to enroll. ECF No. 29-11.

The initial discussions regarding freezing the defined benefit pension plan took place on March 27, 2008 and, as summarized in the meeting minutes,[3] were as follows:

> [Company:]  … I know we have proposed a hard freeze to the pension plan. I want to raise the issue of the enhanced 401k that is called the company plan. Just let me say this. There is this enhanced 401k plan that all salaried folks have. It's not available to those groups that have a pension. It is an "either" "or" situation. It appears to be a very generous 401k plan. I am just throwing that out as a possibility, if we can get what we feel we need on this pension plan.
>
>                  ***
>
> [Company:] The company match is also significantly more than what the union currently has.

---

[3] Richard Parker, the chief spokesman for the Company during the 2008 negotiations, testified that the minutes were not a "word-for-word" transcription but are an accurate representation of what was discussed. ECF No. 29-9 at 15.

[Union:] Would you keep your pension or liquidate it?

[Company:] You could keep a frozen pension until you retire. It would just s[t]ay the same. No more accrual of service.

[Union:] Would you say it is the employee's option to choose the 401k or the pension?

[Company:] It's not an option either or. We can't freeze it just for some employees. It is all or nothing.

[Union:] We need more information on it.

[Company:] I don't have the full information right now. But we can go back and get it. It does [increase] over time. It has the catch up contributions for anyone over 50 and it has significantly more company match. Those are the 3 biggest things. I will get you something better and hopefully this afternoon. I just hope this gets us off dead center so we can make some progress here.

*** 

[Union:] The union's interested in negotiating a comprehensive package. Everything is tied together. We are willing to consider the health care changes, and the company also withdrawing the other proposals is good. We need to do some due diligence on some items. The enhanced 401k -- there is going to be a certain number of employees concerned with money being pumped into the pension such as 2%. What is the cutoff? Who are the employees?

[Union:] We have had a 401k for a few years. The plus of the 401k is that compounding over the year[s]. Most of us will get limited benefit even by putting in the enhanced 401k now. Consequently, 10 more years for people won't go very far to give a decent retirement. Anyone who is probably in their 50's would want something extra. For those employees, there will be negligible positive benefits of the 401k. Could we segregate those needs? We need to do something different for them.

[Union:] We are not sure of the whole picture, but we like the enhanced 401k, we need to try to plug the hole [regarding older workers].

[Company:] I will give you the information on the 401k.

[Company:] I just want to make sure that you realize that the 401k also includes a company match that you get.

***

[Union:] Conceptually, we are willing to give you the two crown jewels in your packet; so maybe you should give on the other stuff; which is the health care and the pension.

[Company:] Keep in mind the enhanced 401k is an expensive benefit; so giving up the pension isn't saving that much money; I just don't want you to think there is a huge savings with the change to the 401k; we are working to give you a comprehensive counter proposal and that will be tomorrow.

[ECF No. 31-8, March 27, 2008 Minutes at 3-6, 15].

The next day the parties met again and continued negotiation for successor agreements to the 2004 CBAs. The following discussion, as summarized in the meeting minutes, took place regarding the 401(k) plan:

[Company:] … If there is interest in the enhanced 401k that is not subject to the grievance and arbitration procedure, and that is in a paragraph in Company Proposal #12. …

***

[Union:] …Company Proposal #12 --we are going to propose a counter that all current employees employed as of April 1, 2008, will be grandfathered into the current pension plan. All current hires will be grandfathered in, that is the language we would be okay with.

***

[Company:] Let me make a couple of comments. I appreciate the fact that you have looked hard at this. We have a couple of major problems — one is the pension, ….

***

[ECF No. 31-8, March 28, 2008 Minutes at 3, 4, 7-9]

During these negotiations, the Company proposed the following language be added to the CBA:

ADD: The employees covered by this agreement will be allowed to participate in the enhanced Company Sponsored 401(k) plan. The employees' entitlement

> to benefits and/or contributions under this plan shall be governed in all respects
> by the provisions of such plan and the administrative rules as set forth and
> interpreted by the Plan Administrator. The Company retains the right to
> amend, modify or terminate the plan in any way, at any time, without
> bargaining with the Union. The Union agrees that no grievance can be filed
> regarding the Company sponsored 401(k) plan and that if a grievance is filed
> the Union agrees that such grievance will not be subject to arbitration.

ECF Nos. 29-40 at ¶ 18; 41 at ¶ 18.  In this provision, the Company retained "the right to amend, modify or terminate the plan in any way, at any time, without bargaining with the Union," because, it explained during negotiations, the Covidien 401(k) Plan is the same plan in which the Company's executives and salaried employees participate and, therefore, the Company "was unwilling to have the Plan subject to bargaining with the Union as to substance or procedure" or to have the same determined through the Union's grievance procedures.  ECF Nos. 31-1 at ¶ 14; 42-1 at ¶ 14.

Knowing that there was a possibility that MB was going to be sold, the Union requested that MB add "change of control" language to MB's proposed language regarding the Covidien 401(k) Plan. ECF No. 29-41 at ¶ 19.  The Union indicated that it was looking for "language like the change of control language that is in the medical plan," as to which the parties had the following discussion during the negotiations:

> [Company:] There is no change in our proposal on the pension. We believe the
> pension should be frozen and people added on the enhanced 401k. We believe
> the additional contributions and match on length of service, then those people
> can make up a significant portion for retirement.
>
> ***
>
> [Company:] I just want to raise this. The [change of control] language that you
> propose there is intended to protect employees in the event of a change in
> control, so there's no dispute over the proposal that you will have the same
> plan as the salaried employees, such as Bill. Those same changes will apply.
> We are only looking at "change of control" language.

[Union:] Yes, only change of control. That is the intent. [Regarding the Company's pension/401(k) proposal] -- what we are going to do is counter you on this. If we were to agree with the enhanced 401k, we want the current pension plan to be based on the best 5 years on the employees retiring, we are also looking for a sunset clause that the current plan would not freeze for a year. We are also looking for language like the change of control language that is in the medical plan.

[ECF No. 31-8, March 29, 2008 Minutes at 4]

The Company advised the Union during negotiations that it "could not guarantee the [401(k) plan] benefits," but "the way they should look at it was that this was the same plan that the managers had, so if the Company decided to terminate the plan, or cut the benefits, there would be ramifications beyond the bargaining unit" and the Company would have to take that into consideration. ECF Nos. 29-40 at ¶ 22, 41 at ¶ 22. According to Parker, there was not a proposal from the Union that would have required benefits to remain substantially the same in the event of a change in control. *Id.* at ¶ 23. Parker explained that even if there had been such a proposal, the Company would have rejected it because "saddle[ing] a potential buyer" with such a substantial liability would have made it impossible to sell the facility. *Id.*

Tim Sutter, President of Local 729 was a participant in the negotiation of the 2008 CBAs. ECF No. 48 at ¶ 15. According to Sutter, the Union "repeatedly raised its concerns that the Company's contributions … could be reduced or eliminated by the new purchasing entity." *Id.* Sutter states that the "Union suggested that any … sale should oblige the purchaser to keep the existing 401(k) in place." *Id.* Sutter states that "the Company eventually agreed to this proposal, drafting language that in the event of a sale, it would require the purchaser to have a substantially similar 401(k) Plan, which the Union accepted." *Id.* at ¶ 16.

Ultimately the parties executed CBAs, effective March 31, 2008 through March 27, 2011, each of which identically stated the following:

> The employees covered by this agreement will be allowed to participate in the Company Hourly 401(k) Retirement Savings and Investment Plan effective July 1, 2008. The employees' entitlements to benefits and/or contributions under this plan shall be governed in all respects by the provisions of such plan and the administrative rules as set forth and interpreted by the Plan Administrator. The Company retains the right to amend, modify or terminate the plan in any way, at any time without bargaining with the Union. The Union agrees that no grievance can be filed regarding the Company sponsored 401(k) Plan and that if a grievance is filed the Union agrees that such grievance will not be subject to arbitration. In the event of a change in ownership, the Company will maintain a 401(k) plan that covers all eligible employees that is substantially similar to the previous plans.

ECF No. 29-40 at ¶ 32.

B.  The 2008 Covidien 401(k) Plan

The 2008 Covidien 401(k) Plan defined "eligible employees" to include hourly, salary, and designated unionized employees of Covidien.  ECF No. 29-40 at ¶ 33. The Summary Plan Description for the 2008 Covidien 401(k) Plan expressly notified eligible employees that "Covidien expects to continue the Plan indefinitely." *Id.* at ¶ 35.  It further provided that "Covidien has the right to modify any terms of the Plan or terminate the Plan, in its discretion at any time," and advised participants that "[i]f Covidien makes material changes to the Plan it will notify you of such changes." *Id.*

From July 1, 2008 through December 31, 2009, the 2008 Covidien 401(k) Plan permitted all eligible employees to contribute a percentage of his or her eligible compensation in 1% increments, subject to IRS limits, and be entitled to an employer matching contribution based upon the following schedule:

| Years of Service | Employee Contribution | Employer Contribution |
|---|---|---|
| 0+ | 0% | 0% |
| 0+ | 1% | 2% |
| 0+ | 2% | 3% |
| 0+ | 3% | 4% |
| 0+ | 4% | 5% |
| 10-19 | 5% | 6% |
| 20-24 | 6% | 7% |
| 25-29 | 7% | 8% |
| 30+ | 8% | 9% |

*Id.* at ¶ 36.

Beginning in January 2010, Covidien modified the 401(k) plan by adding a 3% non-elective employer contribution for all eligible employees and revising the employer matching schedule. *Id.* at ¶ 37. Thus, beginning in January 2010, the Covidien 401(k) Plan contribution schedule was as follows:

| Years of Service | Employee | Employer Matching | Non-Elective |
|---|---|---|---|
| 0+ | 0% | 0% | 3% |
| 0+ | 1% | 0.5% | 3% |
| 0+ | 2% | 1% | 3% |
| 0+ | 3% | 1.5% | 3% |
| 0+ | 4% | 2% | 3% |
| 0+ | 5% | 2.5% | 3% |
| 0+ | 6%+ | 3% | 3% |

*Id.*

Covidien also included a supplemental matching contribution (the "Super Match") for all eligible employees who had at least 20 years of service. Employees were advised that this benefit would expire on December 31, 2014. *Id.*; ECF Nos. 29-22 at 2; 31-15 at 5. The Super Match contribution schedule was as follows:

| Years of Service | Employee | Employer Matching | Non-Elective |
|---|---|---|---|
| 20+ | 6%+ | 4% | 3% |
| 25+ | 7%+ | 5% | 3% |
| 30+ | 8%+ | 6% | 3% |

*Id.* at 38-39.

According to Sutter, the Union "analyzed the[se] changes" to the Plan "and determined that the non-elective contribution and the recalibration of contributions for the senior employees then in effect did not involve a substantial change from the 2008 Plan."[4] ECF No. 48 at ¶ 24.

C. Avantor Performance Materials, Inc. Savings and Retirement Plan

In August 2010, Covidien sold MB. As a result, all hourly, salary and unionized employees were transitioned to a newly-created plan, which ultimately became the Avantor Performance Materials, Inc. Savings and Retirement Plan (the "Avantor 401(k) Plan"). ECF No. 29-40 at ¶ 42. The Avantor 401(k) Plan had the same contribution schedule as the previous plan, and it also adopted the Super Match with the existing expiration date. *Id.* at ¶ 45.

---

[4] It is unclear to the Court why such an analysis would have been done, as there had not been a change of control at the time these changes went into effect that would have triggered the requirement to maintain a substantially similar plan.

D. Negotiation of the 2011 Collective Bargaining Agreements

In February 2011, Avantor and the Union initiated negotiations for successor agreements to the 2008 CBAs. ECF No. 29-40 at ¶ 49. Unlike with the 2008 CBAs, the 401(k) Plan was not a major focus of the 2011 negotiations. ECF No. 49 at ¶ 26. Nevertheless, the record shows that the Union proposed amending the language governing the 401(k) Plan from the 2008 CBAs as follows:

> The employees covered by this agreement will be allowed to participate in the Company Hourly 401(k) Retirement Savings and Investment Plan effective July 1, 2008. The employees' entitlements to benefits and/or contributions under this plan shall be governed in all respects by the provisions of such plan and the administrative rules as set forth and interpreted by the Plan Administrator. ~~The Company retains the right to amend, modify, or terminate the plan in any way, at any time, without bargaining with the Union. The Union agrees that no grievance can be filed regarding the Company sponsored 401(k) plan and that if a grievance is filed the Union agrees that such grievances will not be subject to arbitration. In the event of a change in ownership~~, the Company will maintain a 401 (k) plan that covers all eligible employees that is substantially similar to the previous plans.

ECF No. 29-40 at ¶ 51. The Company rejected this proposal, and ultimately the parties agreed on the following modifications:

> The employees covered by this agreement will be allowed to participate in the Company ~~Hourly~~ 401(k) Retirement Savings and Investment Plan effective July 1, 2008. The employees' entitlements to benefits and/or contributions under this plan shall be governed in all respects by the provisions of such plan and the administrative rules as set forth and interpreted by the Plan Administrator. The Company retains the right to amend~~, or~~ modify, ~~or terminate~~ the plan in any way, at any time, without bargaining with the Union. The Union agrees that no grievance can be filed regarding the Company sponsored 401(k) plan and that if a grievance is filed the Union agrees that such grievances will not be subject to arbitration. ~~In the event of a change in ownership, t~~The Company will maintain a 401 (k) plan that covers all eligible employees that is substantially similar to the previous plans.

11

ECF No. 29-40 at ¶ 53. Avantor agreed to take out "or terminate" because it had no intention of terminating the 401(k) Plan, and agreed to remove "[i]n the event of a change in ownership" because there was no potential sale pending. *Id.* at ¶¶ 54-55.

E.  Recharacterization of the 3% Non-Elective Contribution

In October 2012, Avantor unilaterally approved the recharacterization of the Avantor 401(k) Plan's 3% qualified, non-elective employer contribution as a discretionary, design-based "safe harbor" contribution pursuant to federal tax regulations. ECF No. 29-40 at ¶ 63. The modification took effect January 1, 2013. *Id.*

E.  The 2014 Collective Bargaining Agreements

Avantor and the Union entered into CBAs effective March 31, 2014 to March 26, 2017. There were no changes to the relevant sections governing participation in the Avantor 401(k) Plan, so the language of these sections in the 2014 CBAs (specifically, Article 16, paragraph 9, of the 2014 P&M CBA, and Article 18, paragraph 9, of the 2014 Technical CBA) was identical to that in the 2011 CBAs. ECF No. 29-40 at ¶ 59-62.

F.  The Disputed Change to the Avantor 401(k) Plan

The Super Match contribution that went into effect on January l, 2010, expired by its own terms on December 31, 2014, and, thus, was eliminated from the contribution schedule effective January l, 2015. ECF No. 29-40 at ¶ 64. Also effective January 1, 2015, Avantor eliminated the 3% safe harbor contribution. It did so because it was "trying to make the company profitable" and viewed the contribution as "an excessive benefit." *Id.* at ¶¶ 65-66. Thereafter, Avantor's contribution schedule remained as follows:

| Years of Service | Employee | Employer Matching |
|---|---|---|
| 0+ | 0% | 0% |
| 0+ | 1% | 0.5% |
| 0+ | 2% | 1% |
| 0+ | 3% | 1.5% |
| 0+ | 4% | 2% |
| 0+ | 5% | 2.5% |
| 0+ | 6%+ | 3% |

*Id.*

Local 729 contested the elimination of the 3% Non-Elective Contribution, contending that Avantor breached an obligation under the CBAs to "maintain a 401(k) plan that covers all eligible employees that is substantially similar to the previous plans." Avantor denied the grievance, citing the parties' agreement under the CBA that no grievance can be filed regarding the Company-sponsored 401(k) plan. Local 729 then filed a demand for arbitration with the American Arbitration Association, and Avantor filed the Complaint in the present action seeking, and ultimately obtaining, a declaration that the grievance was not arbitrable. Local 729 counterclaimed in this action, asserting that Avantor breached Article 16, paragraph 9, of the 2014 P&M CBA, and Article 18, paragraph 9, of the 2014 Technical CBA when it unilaterally eliminated the 3.0% Non-elective Employer Contribution on January 1, 2015.[5]

---

[5] To the extent that the Union argues in its motion that the expiration of the "Super Match" constituted a breach of the CBAs, that issue is not before the Court as it was never pled by the Union. The only claim asserted in the Counterclaim relates to the termination of the 3% Non-Elective Contribution, and that is the only issue before the Court.

## II.  Discussion

### A.  Legal Standard - Summary Judgment

Summary judgment is governed by Federal Rule of Civil Procedure 56, and is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Under Rule 56, a fact is material if it influences the outcome of the action under the governing substantive law. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  A material fact raises a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict" for the nonmoving party. *Healy v. N.Y. Life Ins. Co*., 860 F.2d 1209, 1219 n. 3 (3d Cir.1988).

The moving party bears the initial burden of proving that no genuine issue of material fact is in dispute. *Celotex*, 477 U.S. at 323. Once the moving party has carried this burden, the non-moving party must present evidence that a genuine fact issue compels a trial. *Id.* at 324. The non-moving party must offer admissible evidence that establishes a genuine issue of material fact, *id.*, not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Its opposition must rest on "facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir.2006).

In determining whether there is a disputed material fact, "[t]he nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in [that party's]

favor." *Hunt v. Cromartie*, 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999)

(quoting *Anderson*, 477 U.S. at 255). The Court is not to "weigh the evidence and determine

the truth of the matter," but need only determine whether a genuine issue necessitates a trial.

*Anderson*, 477 U.S. at 249. If the non-moving party fails to demonstrate proof beyond a "mere

scintilla" of evidence that a genuine issue of material fact exists, then the Court may grant

summary judgment. *Big Apple BMW v. BMW of North America*, 974 F.2d 1358, 1363 (3d Cir.

1992).

B.  Claim for Breach of Collective Bargaining Agreement

      Local 729's claim turns on the proper interpretation of the 2014 CBA.  As the Third

Circuit recently noted, "[w]e interpret collective-bargaining agreements ... according to

ordinary principles of contract law, at least when those principles are not inconsistent with

federal labor policy." *United Ass'n of Journeyman & Apprentice Plumbers & Pipefitters of*

*U.S. & Canada Local 74 v. Int'l Bhd. of Elec. Workers Local 313*, 643 F. App'x 133, 135 (3d

Cir. 2016) (citing *M & G Polymers USA, LLC v. Tackett*, -- U.S. -- 135 S.Ct. 926, 933, 190

L.Ed.2d 809 (2015)).  Thus, as with any other contract, the parties' intentions control, and

"[w]here the words of a contract in writing are clear and unambiguous, its meaning is to be

ascertained in accordance with its plainly expressed intent." *M & G Polymers USA, LLC v.*

*Tackett,* 135 S. Ct. at 933

      The first step for the Court, therefore, is to determine whether the terms of the relevant

CBAs are ambiguous. *See id.*  "A contract clause is ambiguous when it is 'subject to

reasonable alternative interpretations.'" *Int'l Union, United Auto., Aerospace & Agr.*

*Implement Workers of Am., U.A.W. v. Skinner Engine Co.*, 188 F.3d 130, 142 (3d Cir. 1999)

(quoting *Taylor v. Continental Group Change in Control Severance Pay Plan*, 933 F.2d 1227,

1232 (3d Cir.1991)).   In order "to decide whether a contract is ambiguous, [courts] do not simply determine whether, from [the court's] point of view, the language is clear." *Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 135 (3d Cir. 1993).  Rather, a court should "hear the proffer of the parties and determine if there [are] objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings."  *Id.* Consequently, "[b]efore making a finding concerning the existence or absence of ambiguity, [courts] consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation." *Id.*

In relevant part, the disputed provision from the 2014 CBAs reads as follows:

The employees covered by this agreement will be allowed to participate in the Company 401(k) Retirement Savings and Investment Plan effective July 1, 2008. The employees' entitlements to benefits and/or contributions under this plan shall be governed in all respects by the provisions of such plan and the administrative rules as set forth and interpreted by the Plan Administrator. The Company retains the right to amend or modify, the plan in any way, at any time, without bargaining with the Union. The Union agrees that no grievance can be filed regarding the Company sponsored 401(k) plan and that if a grievance is filed the Union agrees that such grievances will not be subject to arbitration. **The Company will maintain a 401 (k) plan that covers all eligible employees that is substantially similar to the previous plans.**

ECF No. 29-35 at 40 and ECF No. 29-36 at 42 (emphasis supplied).  Local 729 contends that "Avantor's unilateral cessation as of January 1, 2015, of its 3% non-elective contribution … is contrary to" Avantor's obligation under the CBA to "maintain a 401(k) plan that covers all eligible employees that is substantially similar to the previous plans."  ECF No. 41-1 at 1. Local 729 argues that the plain meaning of the relevant contractual provision required "Avantor maintain its contributions to the 401(k) so as to be 'substantially similar' to the requirements of the previous plans." *Id.*

While Local 729's argument is primarily focused on the "plain meaning" of the relevant language, it also contends that the parties' "actual dealings" support its reading of the CBA. *See id.* at 7. It points out that the disputed provision was originally adopted in the 2008 CBAs when the facility was in the process of being sold. As such, Local 729 argues that "[w]hat makes sense in the context of an imminent sale is a substantive requirement on the buyer to keep the equivalent level of contributions in place," because it allows "the buyer to calculate an important part of the annual operating cost going forward …, and the union employees are given security so that they will have an incentive to stay with the company after the purchase for the remainder of the contract period after the sale." *Id.* at 8. Local 729's brief, however, cites nothing in the record to support this proposition.

Contrary to Local 729's assertions, Avantor contends that the CBAs permitted it to make the disputed changes. It points out that under the CBAs, the Company "retain[ed] the right to amend or modify, the plan in any way, at any time, without bargaining with the Union." ECF No. 29-35 at 40 and ECF No. 29-36 at 42. Avantor disputes Local 729's reading of the CBAs, arguing that the language relied upon by Local 729 did not require Avantor to maintain any set level of benefits, but, rather, it required Avantor to maintain a plan substantially similar in design to previous plans, *i.e.*, Avantor could not substantially alter the 401(k) Plan's design, as negotiated by the parties in 2008, by treating bargaining unit employees different from other eligible employees. According to Avantor, its reading is supported by the plain language of the CBAs as well as the negotiation history of the relevant provision.

The first portion of the disputed sentence states that "[t]he Company will maintain a 401(k) plan that covers all eligible employees …". Avantor argues that the use of the

indefinite article "a" preceding "plan" shows that the Company is not required to maintain any specific plan or any level of benefits, allegedly reaffirming that Avantor was free to "amend or modify the plan in any way, at any time," as the parties had agreed it could. ECF No. 29-35 at 40 and ECF No. 29-36 at 42. Avantor concedes, nevertheless, that its right to amend or modify the plan was not unfettered, and that is was required to maintain a plan that was "substantially similar to previous plans." According to Avantor, this meant it was required to maintain a plan in which bargaining unit employees must be treated the same as all other eligible employees. It claims that this is evident, at least in part, by the use of the term "eligible employees,"[6] rather than the unqualified term "employees," as used throughout the CBAs when referring to bargaining unit employees. Avantor contends that the parties' use of the phrase "maintain a 401(k) plan that covers all eligible employees" shows a clear intent to require Avantor to contractually treat the bargaining unit employees the same as it was treating the other classifications of eligible employees with respect to its 401(k) plan.

Avantor also points to the parties' use of the plural "plans" in the phrase "substantially similar to previous plans." According to Avantor, this shows that the parties were not referring to a specific 401(k) plan with a set level of benefits, but instead were referring to the design of the plans generally (*i.e.* treating all eligible employees the same), which would remain constant despite changes that could occur to the benefits over time.

Reading the paragraph as a whole, Avantor argues that its interpretation is the only one that would give full meaning and effect to all of the preceding sentences in the paragraph, in which Avantor contends it retained exclusive right to set the benefit levels for the Avantor 401(k) Plan. It claims that the last sentence in the paragraph, when read in conjunction with

---

[6] There appears to be no dispute here that "eligible employees" refers to all hourly, salary, and unionized employees. *See* ECF No. 29-39 at 26 n. 69.

the second and third sentences, reflects the Company's commitment that, if it modified the benefits/contributions levels offered under the Avantor 401(k) Plan, the modification would not change the parties' agreed upon plan design by treating bargaining unit employees differently than other eligible employees. Avantor contends that any alternative interpretation would render Avantor's unequivocal retention of the right to "amend or modify the plan in any way" utterly meaningless and/or illusory.

Like Local 729, Avantor notes that the disputed language originated during the 2008 negotiations. Avantor points to undisputed evidence showing that, at that time, the subject of the negotiations was the proposed transitioning of Union members to an alternative 401(k) plan--the 2008 Covidien 401(k) Plan. Avantor asserts that the Covidien 401(k) Plan was considered an improvement over the Union's 401(k) Plan due to its inclusion of base pay and overtime within the scope of eligible compensation. A memorandum comparing the plans also shows that the Covidien Plan had a higher company match, allowed older participants to make catch-up contributions, and had no waiting period to enroll. ECF No. 29-11. However, as Avantor points out, the parties were negotiating Union members' participation in the plan, not the specific benefits of the plan.

Finally, Avantor argues that the historical structure of the CBAs undermines Local 729's interpretation of the sentence "[t]he company shall maintain a 401(k) plan that covers all eligible employees that is substantially similar to the previous plans." In 2004, MB guaranteed that the employer matching 401(k) contribution schedule would remain the same during the term of the 2004 CBAs and, as a result, MB and the Union explicitly set forth the employer matching 401(k) contribution schedule in the 2004 CBAs. *See* ECF No. 29-6 at 24 ("The company will match employee contributions at 50% up to the first 6% of base pay.");

ECF No. 29-7 (same). However, the parties did not include any such schedule in the 2008 CBAs, the 2011 CBAs, or the 2014 CBAs. Avantor contends that this because the Company refused to guarantee that it would maintain a certain level of employer contributions in the latter CBAs.

The Court has considered the proffer of the parties, as well as the relevant contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation, including such extrinsic evidence as "the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning." *See Rolls–Royce Motor Cars*, 989 F.2d at 135. An analysis of these factors leads the Court to the conclusion that the disputed language in the 2014 CBAs is not ambiguous and is subject to only one reasonable interpretation—the interpretation advanced by Avantor.

As an initial matter, it is undisputed that the Company advised the Union during negotiations that the Company "could not guarantee the [401(k) plan] benefits." ECF No. 29-40 at ¶ 22; ECF No. 41 at ¶ 22. Even though the Union may have raised concerns that that the Company's contributions could be reduced or eliminated in the event of a sale, the Company explained to the Union that the plan design that the Company was proposing would afford the Union a level of protection against this because "this was the same plan that the managers had, so if the Company decided to terminate the plan, or cut the benefits, there would be ramifications beyond the bargaining unit" and the Company would have to take that into consideration before making any such changes. ECF No. 29-40 at ¶ 22. This plan design was ultimately agreed to by the parties.

Further, looking at the overall document and the structure of the relevant paragraph, the parties unambiguously agreed that Avantor could amend or modify the plan "in any way, at any time." Given the number of variables relevant to any 401(k) plan (*e.g.*, eligible compensation, catch-up contribution eligibility, investment options, loan availability, vesting, waiting period, *see* ECF No. 29-11), this provision would be rendered virtually meaningless under Local 729's construction. The ability of Avantor to amend or modify the plan was bargained for by Avantor and agreed to by the parties. During the negotiations for the 2014 CBAs, the Union proposed removing Avantor's ability to amend or modify the plan. *See* ECF No. 29-40 at ¶ 51. However, this proposal was expressly rejected, and the provision allowing amendments and modification to the plan remained in the final agreement. This underscores the parties' intention to allow Avantor to make changes to the plan.

To the extent that Avantor's right to make changes to the plan is limited by its promise to "maintain a 401(k) plan that covers all eligible employees that is substantially similar to the previous plans," that promise extends, as Avantor notes, only to the design of the plan, under which bargaining unit employees participate equally in the Avantor 401(k) Plan with all other eligible employees. At the time the relevant language was added to the agreements, the parties were not negotiating over what particular benefits the plan should provide, but rather, the focus was on the bargaining unit employees' equal participation in the plan. As noted above, such equal participation provided the Union's members with a level of protection against reductions in their 401(k) plan benefits because the Company would have to consider the effect of making such changes far beyond the bargaining unit. Consequently, the protection against benefit changes that the Union bargained for was not found in the

"substantially similar" language of the relevant paragraph, but rather, in the plan design, *i.e.*, equal participation.

Finally, the record does not support Local 729's assertion that the Company promised to maintain a particular level of contributions to the plan. Indeed, as Avantor points out, where the Company had made such a promise in the past, *i.e.*, the 2004 CBAs (those in effect immediately prior to the 2008 negotiations), the Company's obligation was expressly set out in the agreement. ECF No. 29-6 at 24. ("The company will match employee contributions at 50% up to the first 6% of base pay."); ECF No. 29-7 (same). The 2014 CBAs, however, contains no such express obligation. Rather, as noted above, the parties expressly agreed that the Company could amend or modify the plan in any way, at any time.

A court may grant summary judgment on an issue of contract interpretation if it concludes that the contractual language is subject to only one reasonable interpretation. *IBEW Local Union No. 102 v. Star-Lo Elec., Inc.*, 444 F. App'x 603, 607 (3d Cir. 2011). Here, the Court finds that the disputed language is unambiguous, and did not prohibit Avantor from modifying the 401(k) benefits that Local 729 has challenged here. As such, Avantor did not breach the terms of the 2014 CBAs. Plaintiff's motion will granted and judgment will be entered in favor of Plaintiff on Defendant's counterclaim.

**III. Conclusion**

For the reasons above, Plaintiff's motion for summary judgment is granted, and Defendant's motion for summary judgment is denied. An appropriate Order accompanies this Opinion.

 s/ Douglas E. Arpert        
DOUGLAS E. ARPERT, U.S.M.J.

Dated: March 23, 2018